**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| MICHELE PROVO and SUSAN CHERWA, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>FORD MOTOR COMPANY,<br><br>Defendant. | No.<br><br>**JURY TRIAL DEMANDED**<br><br>**CLASS ACTION COMPLAINT** |

Plaintiffs Michele Provo and Susan Cherwa ("Plaintiffs"), individually and on behalf of all others similarly situated (the "Class" as defined below), by and through their attorneys, allege as follows against Defendant Ford Motor Company ("Ford").

## INTRODUCTION

1. The 2023 and 2024 model year Ford Transit Trail vehicles ("Class Vehicles") are marketed to consumers looking for spacious, off-road capable vehicles for camping.

2. The Ford Transit was initially intended to serve as a business van. However, camping enthusiasts began purchasing the Ford Transit with all-wheel drive and then modifying the vehicles to make them capable of off-roading. In particular, consumers were modifying the vans by lifting the frames, improving the suspension, and adding larger, off-roading tires. In general, such modifications cost consumers between $15,000 and $20,000. It also voided the warranty Ford provides with new vehicle purchases, which forbids any aftermarket modifications.

3. Seeking to recapture the business that aftermarket providers were generating by providing these off-roading modifications, Ford decided to offer a trim package for its Ford Transit vehicles dubbed the "Ford Transit Trail." This package offers, direct from Ford, many of the features that camping enthusiasts sought in the aftermarket including lifted frames and suspension and larger, 30.5-inch tires, available to consumers in a package that would not void Ford's new vehicle warranty. The manufacturer's suggested retail price of these upgrades is $12,500.

4. Ford promised that "the Transit Trail adventure-ready chassis is re-tuned and tested to meet the same BUILT FORD TOUGH durability standards as the rest of the Transit lineup."[1] But that was a false promise.

5. Simply put, Ford marketed the 2023 to 2024 model year Ford Transit Trail class vehicles specifically for off-road driving, but the geometry of the wheel wells and the suspension cannot accommodate the 30.5-inch tires—a substantial part of what makes the "Ford Transit" the "Ford Transit *Trail*." Due to this improper geometry, the standard 30.5-inch tires strike the wheel arch liners, which in turn leads to damage to both the wheel wells and the tires and poses a safety concern (the "Defect").

6. A safe and properly designed vehicle—especially a high-profile van marketed for off-roading—must have suspension and wheel wells that fit the standard-equipped tires. Tires are among the most critical components of any vehicle, as they are the sole point of contact between the vehicle and the road. Their function is not limited to merely supporting the vehicle's weight—they are essential to traction, braking, steering responsiveness, and stability. A failure in these areas can have catastrophic consequences. Accordingly, any condition that interferes with the proper operation of a tire directly implicates vehicle safety.

7. In the Class Vehicles, specifically, the Defect poses multiple safety concerns. When a tire comes into contact with the inside of the wheel well, it can restrict or alter the intended movement of the wheel and suspension components. This may reduce steering responsiveness or stability during cornering. Repeated friction between the tire and the wheel well can cause uneven or accelerated tread wear, sidewall damage, or heat buildup. This degradation can compromise the structural integrity of the tire, increasing the risk of a blowout or tread separation—both of which are major safety hazards. Further, the tires striking the wheel wells can create a noise that startles the driver, especially if it occurs while turning or braking, leading to a loss of concentration or overcorrection.

[1] https://media.ford.com/content/fordmedia/fna/us/en/news/2022/11/03/adventure-comes-standard--ford-pro-reveals-new-2023-transit-trai.html

8. As a result of the Defect, Ford instituted Recall No. 24V226 (the "Tire Recall"). In the Safety Recall Notice,[2] Ford states "Ford Motor Company has decided that a defect which relates to motor vehicle safety exists in certain 2023-2024 Transit Trail Vehicles[]." In a section labeled "**What is the risk?**" Ford states: "Repeated contact of a front tire with the wheel arch liner and body flange may lead to rapid air loss and tread-belt separation, which can result in a loss of vehicle control and increase the risk of a crash." Under the recall, Ford "has authorized your dealer to inspect the weld flange and repair if needed, replace all valve stems and all 4 tires with Goodyear 235/65R16C tires, replace both front wheel arch liners, update the vehicle software, and replace the Safety Certification and TREAD Act labels free of charge (parts and labels)." In sum, the Recall primarily consists of Ford removing the 30.5-inch offroad tires and replacing them with 28.5-inch versions. This "repair," in turn, lowers the ground clearance of the vehicle, defeating the purpose of Class Members' purchase of an off-road capable vehicle. For Class Members who choose to have the recall performed, Ford does not allow them to keep possession of their 30.5-inch tires. Class Members have not been offered any compensation for the failure of the Ford Transit trail package in their Class Vehicles, for which they specifically bargained and paid, such that their Class Vehicles were not off-road capable as they were represented.

9. Although Ford promised off-road capable vehicles suitable for camping and other adventurous purposes, Ford's recall removes the primary benefit of the Transit "Trail" models—the superior, 30.5-inch tires and superior ground clearance. Accordingly, aside from their lifted frames and suspension, Class Members having the recall performed are left with vehicles closer to the less expensive Ford Transit base model than the Transit Trail.

10. Plaintiffs and Class Members trusted that Ford, as an experienced manufacturer, would be able to design, manufacture, and deliver the Class Vehicles as it represented and promised. Instead, Ford failed to properly modify the Ford Transit design such that the subsequent

[2] Available at https://static.nhtsa.gov/odi/rcl/2024/RIONL-24V226-5689.pdf (last accessed April 30, 2025).

Ford Transit Trail was capable of being an off-road capable camping vehicle with sufficient ground-clearance for 30.5-inch tires.

11. Despite Ford's knowledge of the Defect, which renders the Class Vehicles unsuitable for their intended purpose, it has failed to provide adequate repairs under warranty and has also failed to disclose the Defect to unsuspecting consumers.

12. Due to Ford's misstatements and failure to disclose that the Defect rendered the Class Vehicles unsuitable for the specific purpose for which they were purchased, i.e. off-roading, Plaintiffs and Class Members were deprived of the benefit of their bargain in purchasing or leasing their Class Vehicles. These vehicles simply are not capable of the performance, namely off-roading, that Ford promised and that Plaintiffs and Class Members paid for, Plaintiffs accordingly seek relief both for themselves and for other current and former owners or lessees of these Class Vehicles.

## JURISDICTION AND VENUE

13. This action is properly before this Court and this Court has subject matter jurisdiction over this action under the Class Action Fairness Act. At least one member of the proposed class is a citizen of a different state than Ford, the number of proposed class members exceeds 100, and the amount in controversy exceeds the sum or value of $5,000,000.00 exclusive of interests and costs. *See* 28 U.S.C. § 1332(d)(2)(A).

14. In addition, under 28 U.S.C. § 1367, this Court may exercise supplemental jurisdiction over the state law claims because all the claims are derived from a common nucleus of operative facts and are such that Plaintiffs would ordinarily expect to try them in one judicial proceeding. Further, this Court may also exercise supplemental jurisdictions over Plaintiffs' Magnuson-Moss Warranty Act claims.

15. This Court has personal jurisdiction over Defendant because it is incorporated in the State of Delaware; has consented to jurisdiction by registering to conduct business in the state; maintains sufficient minimum contacts in Delaware; and otherwise intentionally avails itself of the

markets within Delaware through promotion, sale, marketing and distribution of its vehicles, which renders the exercise of jurisdiction by this Court proper and necessary as Ford is "at home" in Delaware.

16. Venue is proper in this District pursuant to 28 U.S.C. § 1391(a)-(c). A substantial part of the events or omissions giving rise to the claims occurred in this District. Plaintiffs may properly sue Ford in this District, Ford's state of incorporation.

## PARTIES

### I. Plaintiffs

**Plaintiff Michele Provo**

17. Plaintiff Michele Provo is domiciled in and is a citizen of Minnesota.

18. In or around February 2024, Plaintiff Provo purchased a new 2024 Ford Transit Cargo Van equipped with the Transit Trail Package from AutoNation Ford White Bear Lake, an authorized Ford dealership located in White Bear Lake, Minnesota. Among other modifications, the Transit Trail Package adds larger, rugged 30.5-inch Goodyear Wrangler Workhorse all-terrain tires to Ford's base Transit Van. Plaintiff Provo's vehicle came with a standard 3 year/ 36,000-mile bumper-to-bumper warranty.

19. Plaintiff Provo purchased her vehicle primarily for personal, family, or household use with the intention of using the vehicle for off-road, outdoor, and/or camping purposes.

20. Safety, reliability, and quality of the vehicle and its components were important factors in Plaintiff Provo's decision to purchase her vehicle. For approximately one year before making her purchase, Plaintiff Provo researched the vehicle online, by "Googling" the vehicle, watching videos on YouTube to learn about its features and to compare it to Mercedes-Benz Sprinter vehicles, and looking up information on Ford's website. Thereafter, Plaintiff Provo ordered the vehicle on Ford's website and picked it up from AutoNation Ford White Bear Lake.

21. At the dealership, Plaintiff Provo reviewed the vehicle's Monroney Sticker or "window sticker," which listed official information about the vehicle. Plaintiff Provo also

discussed the safety features of the vehicle with dealership personnel, who made no reference to the Defect. Plaintiff Provo believed that the vehicle would be safe and reliable, and that she could use it for its advertised purpose of off-road travel.

22. Within about two months of purchasing the Class Vehicle, Plaintiff Provo learned of the Tire Recall through written correspondence from Ford and through online sources. Subsequently, Plaintiff Provo learned that the essence of Ford's planned recall remedy was simply to replace the Class Vehicles' large, rugged tires with smaller tires. Ford advertised Class Vehicles as off-road capable, and Plaintiff Provo purchased it for those capabilities. However, without the advertised tires, the Class Vehicles are no longer fit for this purpose and Plaintiff Provo will not be able to use the vehicle for the advertised purpose.

23. Because of the Defect and the lack of an effective remedy from Ford, Ms. Provo has had to spend almost $2,000 out of pocket on suspension enhancement, including having "SumoSprings" and skid plates added to her vehicle.

24. Prior to the purchase of her vehicle, Plaintiff Provo did not know about the Defect. Ford had exclusive knowledge of the Defect and actively concealed it. The Defect was material to Plaintiff Provo. Had Ford disclosed the Defect, Plaintiff Provo would have been aware and would not have purchased her vehicle or would have paid less for it.

25. As a result of the Defect, Plaintiff Provo has lost confidence in the ability of the Class Vehicle to provide safe and reliable transportation for the advertised ordinary purposes. Further, Plaintiff will be unable to rely on the Class Vehicles' advertising or labeling in the future, and so will not purchase or lease another Class Vehicle, although Plaintiff would consider doing so were the Defect remedied and/or the advertising and labeling corrected.

26. At all times, Plaintiff Provo, like all Class Members, has driven her vehicle in a manner both foreseeable and in which it was intended to be used.

**Plaintiff Susan Cherwa**

27. Plaintiff Susan Cherwa is domiciled in and is a citizen of Virginia.

28. On or around April 3, 2024, Plaintiff Cherwa purchased a 2023 Ford Transit Cargo Van equipped with the Transit Trail Package from Woody's Automotive Group in Chillicothe, Missouri. As discussed further below, Plaintiff Cherwa purchased her van through Ford-certified upfitter VanDOit and from Woody's Automotive Group, through which the VanDOit-upfitted Ford Transit Trail was sold.

29. Plaintiff Cherwa purchased her vehicle primarily for personal, family, or household use with the intention of using the vehicle for off-road, outdoor, and/or camping purposes.

30. Safety, reliability, and quality of the vehicle and its components were important factors in Plaintiff Cherwa's decision to purchase her vehicle. Plaintiff Cherwa began researching potential off-road-capable vehicles in September 2023, including offerings from Mercedes-Benz, RAM, and Ford. In particular, Plaintiff Cherwa researched the Ford Transit Trail on Ford Motor Company's official website, www.Ford.com and its list of Ford-certified "upfitters"—businesses which upgrade new Ford vehicles, including the Ford Transit, and then provide them for sale to consumers. "Vandoit" is one such upfitter. Ford approached Vandoit for assistance in the development of the Transit Trail, and Ford provided Vandoit with its Ford QVM (Qualified Vehicle Modifier) designation.

31. In October 2023, Plaintiff Cherwa reached out to Vandoit to continue her pre-purchase research. She corresponded with Vandoit personnel regarding the Transit Trail. After two months of further research and investigation, Plaintiff Cherwa decided to make an initial downpayment to Vandoit in December 2023.

32. Plaintiff Cherwa's research continued. In January 2024, Plaintiff Cherwa requested the Ford-authored Monroney "window sticker" label for the Ford Transit Trail vehicle she was considering, for the purpose of reviewing the options and other information provided thereon. Vandoit provided Plaintiff Cherwa with the Monroney label on January 16, 2024.

33. In April 2024, Plaintiff Cherwa traveled to the Vandoit facility in Missouri. Once there, she spoke with personnel regarding the Transit Trail. Plaintiff Cherwa also discussed the safety features of the vehicle with personnel before purchasing, who made no reference to the

Defect. Plaintiff Cherwa believed that the vehicle would be safe and reliable, and that she could use it for its advertised purpose of off-road travel. Accordingly, on April 3, 2024, Plaintiff Cherwa signed the purchase contract and purchased the vehicle. At the time of sale, the vehicle had 150 miles on the odometer. The selling dealership was Woody Automotive Group.

34. Approximately one hour after Plaintiff Cherwa signed the purchase paperwork for the vehicle, a manager at the dealership informed her of the Tire Recall, and disclosed that Ford had not yet announced the remedy. Instead of delivering the vehicle to Plaintiff Cherwa's home in Virginia as planned, the dealership suggested that the vehicle remain in its possession until the recall remedy could be completed.

35. From April 2024 to September 2024, Plaintiff Cherwa made payments on a vehicle that she did not have. She missed the summer camping / off-roading season. In or around September 2024, after Plaintiff Cherwa complained that she had been waiting several months for a recall remedy, Vandoit told Plaintiff Cherwa that it could fix the tire rub issue by removing the wheel well liner, modifying the pinch weld, and upgrading the suspension. With this work, Plaintiff Cherwa was told that the original 30.5" tires could remain on the vehicle. Plaintiff Cherwa consented to Vandoit making these repairs because they are a Ford-certified upfitter, and she took delivery of the vehicle in October 2024.

36. In or around March 2025, Plaintiff Cherwa received a notification on her Ford mobile application stating that Ford's planned recall remedy was to replace the Class Vehicles' large, rugged 30.5-inch tires with smaller tires. Ford advertised the Class Vehicles as being equipped with off-road capabilities, and Plaintiff Cherwa purchased the vehicle for this reason. However, without the advertised larger 30.5-inch tires, the Class Vehicles are no longer fit for off-roading and consequently, Plaintiff Cherwa will not be able to use the vehicle for the advertised purpose.

37. Prior to the purchase of her vehicle, Plaintiff Cherwa did not know about the Defect. Ford had exclusive knowledge of the Defect and actively concealed it. The Defect was material to Plaintiff Cherwa. Had Ford disclosed the Defect, Plaintiff Cherwa would have been aware and

would not have purchased her vehicle or would have paid less for it.

38. As a result of the Defect, Plaintiff Cherwa has lost confidence in the ability of the Class Vehicle to provide safe and reliable transportation for the advertised ordinary purposes. Further, Plaintiff will be unable to rely on the Class Vehicles' advertising or labeling in the future, and so will not purchase or lease another Ford Transit Trail or similar Ford vehicle, although Plaintiff would consider doing so were the Defect remedied and/or the advertising and labeling corrected.

39. At all times, Plaintiff Cherwa, like all Class Members, has driven her vehicle in a manner both foreseeable and in which it was intended to be used.

**II. Defendant**

40. Ford Motor Company is a Delaware limited liability company with its corporate headquarters located at 1 American Road, Dearborn, Michigan 48126. Ford Motor Company is registered to do business in the State of Delaware. Ford designs, manufacturers, markets, and distributes motor vehicles, parts, and other automotive products for sale in the United States and throughout the world. Ford is the warrantor and distributor of the Class Vehicles in Delaware and throughout the United States.

41. At all relevant times, Ford is engaged in the business of designing, manufacturing, constructing, assembling, warranting, marketing, advertising, distributing, and selling vehicles and motor vehicle components, including the Class Vehicles, under the "Ford", "Lincoln", and other brand names in Delaware and throughout the United States of America using the "Ford Pro" trademark.

42. To sell vehicles to the general public, Ford enters into agreements with dealerships who are then authorized to sell Ford vehicles to consumers such as Plaintiff. In return for the exclusive right to sell new Ford vehicles in a geographic area, authorized dealerships are also permitted to service and repair these vehicles under the warranties Defendant provides directly to consumers. These contracts give Defendant a significant amount of control over the actions of the

dealerships, including sales and marketing of vehicles and parts for those vehicles. All service and repair at an authorized dealership are also completed according to Ford's explicit instructions, issued through service manuals, technical service bulletins ("TSBs"), and other documents. Per the agreements between Defendant and the authorized dealers, consumers such as Plaintiffs can receive services under Defendant's issued warranties at dealer locations that are convenient to them.

43. Ford also develops and disseminates the owners' manuals, warranty booklets, maintenance schedules, advertisements, and other promotional materials relating to the Class Vehicles. Ford owns the copyright to all marketing materials for the Ford Transit Trail van and owns the domain name of FordPro.com. Ford is also responsible for the production and content of the information on the Moroney Stickers.

44. Ford also develop and disseminates the owners' manuals, warranty booklets, maintenance schedules, advertisements, and other promotional materials relating to the Class Vehicles. Ford is also responsible for the production and content of the information on the Moroney Stickers.

## FACTUAL ALLEGATIONS

45. For years, Ford has designed, manufactured, distributed, sold, leased, and warranted the Class Vehicles.

46. Ford marketed and sold thousands of Class Vehicles nationwide, including through its nationwide network of authorized dealers and service providers. After these dealerships sell cars to consumers, including Plaintiffs and Class Members, they acquire additional vehicles inventory from Ford to replace the vehicle sold, increasing Ford's revenues. Ford also sells replacement parts to its dealerships for use to service, maintain, and repair vehicles, including the Class Vehicles. Thus, Plaintiffs' and Class Members' purchase of Class Vehicles and their

replacement parts accrues to the benefit of Ford by increasing its revenues. In 2023, Ford reported $7 billion in Ford Pro revenues, the segment of its business which produces the Transit van.[3]

## III. Ford's Statements About Ford Transit Trail

47. In late 2022, Ford announced that it was producing a new Ford Transit Trail van, "an upfit-ready adventure van that leverages the same capability, versatility and customization options that helped make Ford Transit America's best-selling commercial van."[4]

48. This was Ford's deliberate foray into the "van-life" consumer space. Van-life is a lifestyle in which people choose to live in their car, van, or other motor vehicle, such as either full-time or for large periods of time. Ford's advertising targeted a consumer group who wanted an off-road capable vehicle for camping purposes but also wanted a vehicle with large interior room for living purposes.

49. Ford was already experienced in working with Ford-approved van "upfitters," or third parties who modify Ford vehicles including heavy trucks and Transit vans for an individual consumer's particular needs.[5]

50. However, upfitting a Ford product often voids the New Vehicle Limited Warranty that Ford provides directly to consumers upon purchase of a new vehicle from an authorized Ford dealership.

51. Ford decided to provide a direct-from-the-factory version of its Transit Van that




[3] *See* 2023 Ford Annual Report. Ford Pro is not a separate company, but instead
[4] https://media.ford.com/content/fordmedia/fna/us/en/news/2022/11/03/adventure-comes-standard--ford-pro-reveals-new-2023-transit-trai.html
[5] *See* https://www.fordupfits.com/commercial.

was suitable for off-roading and included many of the features that upfitters would add to a Transit Van, while also being warrantied by Ford. This was the new Ford Transit Trail, first available in the 2023 model year.

52. As described by Ford, under the trade name Ford Pro, the Ford Transit Trail is "Everything America's best-selling commercial van offers, plus these features designed especially for van-life adventures" including "16-inch Transit Trail black alloy wheels," "30.5-inch Goodyear Wrangler Workhorse all-terrain tires," "Intelligent All-Wheel Drive," and a "Unique skid play-style front bumper."

53. These standard features also included a "3.5-inch increased ride height with improved ground clearance, approach angle and departure angle" and "Transit Trail splash guards and wheel arch cladding." These features were necessary to allow the vehicle to go off-road while still protecting the vehicle from elements, as the advertisement and brochures pictured:



54. As one brochure put it, "No Pavement? No Problem."




55. Ford also stated that its network of dealers and a dedicated customer assistance center, consumers could rely on Ford to be with them in the event of trouble with their vehicles.



56. Ford also offered its standard New Vehicle Limited Warranty with the Ford Transit Trail, including a 3 year or 36,000 miles, whichever comes first, bumper to bumper warranty, and a 5 year or 60,000 miles, whichever comes first, powertrain warranty. This provided piece of mind to Plaintiffs and Class Members, who believed and trusted they could get an off-ready camping vehicle backed by a Ford warranty by a manufacturer with expertise in making such vehicles.

57. Despite Ford's promises and their explicit reference to their years of experience in constructing and selling such vehicles, the Class Vehicles were not off-road capable in the manner described by Ford.

58. In an effort to render their Ford Transit Trails off-road capable, Class Members have made various modifications at their own expense. For example, some Class Members have installed suspension enhancement materials, including "SumoSprings," lift kit springs, king coils, and skid plates to protect vulnerable areas under the vehicles as well as the intercoolers. Indeed, third party automobile parts manufacturer Weldtec began selling a transit trail-specific lift kit for the purpose of correcting tire rub and other symptoms, and some Class Members are forced to pay $8,000 for this Weldtec product to make their vehicles capable of off road driving.

**IV. The Defect**

59. Since at least 2022, Ford has been manufacturing and selling the Class Vehicles with identical Transit Trail packages that include, *inter alia,* "3.5-inch increased ride height, a 2.75-inch wider track, 30.5-inch Goodyear Wrangler Workhorse all-terrain tires, and 16-inch black alloy wheels[,]"and "improved ground clearance, approach angle and departure angle," which are the same or substantially similar in all Class Vehicles.

60. The front tires, specifically advertised 30.5-inch Goodyear Wrangler Workhorse all-terrain tires, sit within the wheel well and are framed by wheel arch liners. The wheel arch liners fit directly above the wheel as demonstrated in Figure 1:




Figure 1

61. Wheel arch liners protect the wheel well from debris, dirt, water, and other intrusive elements and prevents corrosion of a vehicle's undercarriage and wheel well.

62. When the vehicle is loaded, the weight lowers the body of the vehicle closer to the tires. Similarly, when turning or braking, the clearance between the tires and the wheel well and wheel arch liners is reduced.

63. Discovery will show that the Class Vehicles suffer from design defects that fail to provide sufficient clearance for the tires within the wheel wells when turning, braking, or driving the vehicle with loads close to or at the advertised Front Gross Axle Weight Rating.

64. Due to the insufficient clearance, the positioning of the tires of a loaded vehicle when braking or turning causes the front tires to rub against the wheel arch liners, which in turn causes the tires to wear out prematurely and can also cause air loss and tread separation. Air loss and tread separation can lead to loss of control of the vehicle, increasing the risk of a crash.

65. As a result of the Defect, a large number of drivers report that their front tires are

rubbing against the wheel arch liner and body flange, which may lead to rapid air loss and tread-belt separation. This, in turn, can result in a loss of vehicle control and increase the risk of a crash in their Class Vehicles. As a result, Class Members must resort to purchasing new wheel arch liners, which may only solve the problem temporarily.

66. The Defect was inherent at the time of sale or lease, but it only becomes apparent to a driver after significant time has passed, in part because the effect on tire tread and air loss due to the tires' rubbing against the wheel arch liners is gradual. Moreover, these symptoms cause unsafe conditions, including the loss of control of the vehicle and present a safety hazard, as admitted by Ford in its Recall, *supra,* Part IV.C.

67. Moreover, Ford's solution proposed in its Recall, *supra,* Part IV, proposes to resolve the Defect by replacing the 30.5-inch 245/75R16 Goodyear Wrangler Workhorse AT tires with 28-inch tires, which are the smaller size tires installed on regular, non-Trail Ford Transit vans. Additionally, the change to smaller tires reduces the vehicle's ground clearance from 6.7 inches to 5.5 inches, making it unsafe to take off-roading , defeating the purpose of Class Members' purchase of an off-road capable vehicle and rendering the amount they paid for the Transit Tail package a complete loss.

68. Ford knew about the Defect present in every Class Vehicle, along with the attendant safety problems, and concealed this information from Plaintiffs and Class Members at the time of sale, lease, repair, and thereafter.

69. If Plaintiffs and Class Members had known about the Defect at the time of sale or lease, Plaintiffs and Class Members would not have purchased or leased the Class Vehicles or would have paid less for them.

70. As a result of their reliance on Ford's omissions, owners and/or lessees of the Class Vehicles suffered an ascertainable loss of money, property, and/or value of their Class Vehicles. Additionally, because of the Defect, Plaintiffs and Class Members were harmed and suffered actual damages in that the Class Vehicles are defective, that they overpaid for defective vehicles, and that

the Class Vehicles' insufficient clearance for the wheels and tires increase Class Members' chances of being involved in a collision.

### A. Complaints Reported to NHTSA

71. Federal law requires automakers like Ford to be in close contact with NHTSA regarding potential auto defects, including imposing a legal requirement, backed by criminal penalties for violation, of confidential disclosure of defects by automakers to NHTSA, including field reports, customer complaints, and warranty data. *See* TREAD Act, Pub. L. No. 106-414, 114 Stat. 1800 (2000).

72. Automakers have a legal obligation to identify and report emerging safety-related defects to NHTSA under the Early Warning Report requirements. *Id.* Similarly, automakers monitor NHTSA databases for consumer complaints regarding their automobiles as part of their ongoing obligation to identify potential defects in their vehicles, including those which are safety related.

73. Many Class Vehicle owners and lessees submitted complaints about the Defect with NHTSA's Office of Defect Investigations ("ODI").

74. From its monitoring of the NHTSA databases, Ford knew or should have known of the many complaints about Defect logged by NHTSA ODI, and the content, consistency, and large number of those complaints alerted, or should have alerted, Ford that the Defect is widespread in Class Vehicles, and a safety hazard.

75. The following complaints are a sampling of the scores of available complaints through NHTSA's website, www.safercar.gov, which reveal that Ford, through its network of dealers and repair technicians, was made aware of many Defects in Class Vehicles.[6]:

a. **DATE OF INCIDENT:** August 20, 2024
**DATE COMPLAINT FILED:** November 20, 2024
**NHTSA/ODI ID:** 11626494
**SUMMARY:** AUGUST 2024: VEHICLE STARTED TO

[6] The following complaints are reproduced as they appear online. Any typographical errors are attributable to the original author.

GRAB/PULL WHEN BREAKING AND TURNING TO THE RIGHT, ESPECIALLY AROUND CURVES. THIS PROGRESSED TO HAPPENING WHEN THE VAN WEIGHT SHIFTED FORWARD DURING BREAKING. DEALERSHIPS IN EUGENE, OREGON AND MARIN, CA CONFIRMED THIS BEHAVIOR IS RELATED TO THE WHEEL CLEARANCE. DEALERSHIP IN EUGENE CONFIRMED DAMAGE TO THE WHEEL WELL LINER. I WAS UNABLE TO GET ANY SUPPORT FROM FORD REGARDING A LOANER OR ASSISTANCE GETTING MY VAN HOME 900+ MILES. SEPTEMBER 2024: LOADED EXCESS WEIGHT INTO THE REAR OF THE VAN AND DROVE SLOWLY BACK TO SOUTHERN CALIFORNIA. FOR SAFETY PURPOSES, DEALERSHIP ADVISED "PARKING THE VAN UNTIL FORD COMES UP WITH SOMETHING." I HAVE BEEN UNABLE TO USE THE VAN SINCE, WITH NO UPDATES FROM FORD. THERE HAVE BEEN FOUR RECALLS (THE REAR VIEW CAMERA IS FIXED) AND AT LEAST ONE CUSTOMER SATISFACTION SERVICE (SOFTWARE UPDATE FOR THE TRANSMISSION PERFORMED IN EUGENE). VAN HAS LESS THAN 5,000 AND WAS PURCHASED IN MARCH 2024.

b. **DATE OF INCIDENT:** March 22, 2024
**DATE COMPLAINT FILED:** September 25, 2024
**NHTSA/ODI ID:** 11616512
**SUMMARY:** I AM FILING A COMPLAINT OVER THE DELAYS BY FORD IN FIXING THE FOLLOWING RECALLS. I AM CONCERNED OVER MY SAFETY AND MY FAMILIES SAFETY WHILE DRIVING THE FORD TRANSIT. CAMPAIGN/NHTSA# 24S21/24V226 ISSUE DATE 2024-03-22 CAMPAIGN/NHTSA# 24S46/24V542 ISSUE DATE 2024-07-23 CAMPAIGN/NHTSA# 24S48/24V591 ISSUE DATE 2024-08-09.

c. **DATE OF INCIDENT:** March 22, 2024
**DATE COMPLAINT FILED:** July 11, 2024
**NHTSA/ODI ID:** 11601047
**SUMMARY:** I HAVE BEEN WAITING FOR THE TRANSIT TRAIL TIRE RUB RECALL FIX TO BE ANNOUNCED AND FORD IS TAKING FOREVER. PRETTY MUCH ALL OF US ARE BUILDING OUT OUR VANS AND THIS REALLY THROWS A WRENCH (NO PUN INTENDED) INTO THINGS. FORD IS EFFECTIVELY NEUTERING OUR SPECIAL OFF-ROAD VANS BY PUTTING STOCK TRANSIT TIRES ON THEM. IT'S EXTREMELY FRUSTRATING. BUT I WOULD AT LEAST PREFER TO HAVE THEM DO WHAT THEY ARE GOING TO DO THEN MOVE ON. INSTEAD I AM STUCK, WAITING. AND WAITING. AND WAITING. THE RECALL WAS SUBMITTED ON MARCH 22ND. IT'S BEEN 3 AND A HALF MONTHS.

d. **DATE OF INCIDENT:** April 3, 2024
**DATE COMPLAINT FILED:** July 10, 2024
**NHTSA/ODI ID:** 11600847
**SUMMARY:** REGARDING SAFETY RECALL - I DO NOT FEEL THIS HAS BEEN HANDLED IN A REASONABLE AMOUNT OF TIME. TODAY IS JULY 10TH AND NO REMEDY HAS BEEN

DETERMINED. I HAVE NOT TAKEN POSSESSION OF MY VAN THAT WAS PURCHASED ON APRIL 3, 2024. AT THE TIME I WAS UNAWARE OF THE SAFETY RECALL, UNTIL THE DAY OF TRAINING AT THE UPFITTERS. TO DATE, I HAVE NOT RECEIVED ANY NOTIFICATION FROM FORD ON THIS RECALL. I HAVE MADE 3 PAYMENTS, HAVE REGISTERED, PAID INSURANCE ON A VAN THAT I HAVE NEVER DRIVEN OFF THE LOT. THIS IS BEYOND FRUSTRATING BECAUSE A TIRE RUB WITH TIRES SUCH AS THE ONES SOLD IN THE TRAIL PACKAGE ARE KNOWN FOR RUBBING IF MODIFICATIONS ARE NOT MADE. FORD HAS BEEN NEGLIGENT IN TESTING THE TRAIL PACKAGE THAT WE PAID APPROXIMATELY 10K FOR.

e. **DATE OF INCIDENT:** March 28, 2024
**DATE COMPLAINT FILED:** May 15, 2024
**NHTSA/ODI ID:** 11588853
**SUMMARY:** NO INCIDENT, I DO NOT FEEL AS IF THE REMEDY BEING "NOT YET AVAILABLE" HAS BEEN HANDLED IN WHAT IS CONSIDERED A "TIMELY MANNER". ALL LIFTED VEHICLES WILL HAVE A TIRE RUB, ADJUSTMENTS HAVE TO BE MADE TO ACCOMMODATE THE LARGER SIZED TIRES. FORD DID A BODY LIFT RATHER THAN A SUSPENSION LIFT ON THE FORD TRANSIT TRAIL AND DID NOT HAVE THEIR 3RD PARTY MADE THE NECESSARY "ACCOMMODATIONS" TO SUPPORT THIS TIRE SIZE. I AM CURRENTLY PAYING A LOAN FOR THIS VEHICLE AND INSURANCE AND MY VAN IS AT THE UP-FITTERS, AWAITING THE REMEDY. THE FORD TRANSIT TRAIL PACKAGE IS AN OFF ROAD PACKAGE, AND MADE FOR UP-FITTING. WHEN WEIGHT IS ADDED TO THIS CARGO VAN, THAT IS WHEN THE RUB OCCURS. THERE ARE "SIMPLE FIXES" ACCORDING TO THE PROFESSIONALS ON LIFTING VEHICLES. WHY CAN'T THIS SIMPLE FIX BE DONE IN A TIMELY MANNER. THERE ARE ONLY 1900 VEHICLES IN THIS RECALL. IN THE GRAND SCHEME OF THINGS THIS IS NOT MANY!

f. **DATE OF INCIDENT:** April 23, 2024
**DATE COMPLAINT FILED:** May 15, 2024
**NHTSA/ODI ID:** 11588915
**SUMMARY:** FORD HAS FAILED TO FIX 2 RECALLS. REAR DIFFERENTIAL IS HOWLING AND POTENTIALLY LOW ON FLUID PER RECALL--MY FORD DEALER CANNOT GET TO IT UNTIL AUGUST. LOCAL DEALER IS CHAPEL HILLS FORD IN COLORADO SPRINGS--THAT IS WERE I PURCHASED VEHICLE ON [XXX] 2024. THEY HAVE BEEN NO HELP. BOTH FRONT TIRES RUBBING THE BODY AT ANY SLIGHT TURN--LIKE INTO A DRIVEWAY--WITH NO LOAD IN THE VAN. TIRES AND BODY BOTH GETTING DAMAGED. NO RESOLUTION FROM FORD. BECAUSE OF TIRES RUBBING, IT HAS NOW CAUSED THE WHEEL WELL LINER TO DISLODGE FROM THE PLASTIC FASTENERS AND I AM WORRIED THE LINER WILL COMPLETELY FALL INTO THE FRONT WHEEL

AND STEERING LINKAGE CAUSING A WRECK. INFORMATION REDACTED PURSUANT TO THE FREEDOM OF INFORMATION ACT (FOIA), 5 U.S.C. 552(B)(6)

**B. Customer Complaints on Online Forums**

76. Similarly, complaints posted by consumers in internet forums demonstrate that the defect is widespread and dangerous and that it can manifest without warning and/or suitable repair. The complaints also indicate Ford's awareness of the problems with the Defect and how potentially dangerous the defect is for consumers, not only to the extent such complaints reference contact with authorized dealerships and Ford itself, but also because Ford employs staff to monitor the perception of the brand. Below are a handful of examples of the myriad complaints Class Members are making online. (spelling and grammar mistakes remain as found in the original):

77. On a group called "Ford Transit Trail Adventure Van" on facebook.com, a consumer of a Ford Transit Trail vehicle posted the following:[7]

> I'm really struggling with the solution for the tire rub recall. Placing smaller tires on this van results in a domino effect of other losses and the result is, the cost of the "trail" package is incredibly overpriced! In hindsight probably would have been better to not get the trail package and do the upgrades separately which then makes no purpose for this package! Ford should offer smaller tires plus a cash refund of some sort at the minimum. Any thoughts here?

78. On a Ford subreddit on reddit.com, a consumer of a 2023 Ford Transit Trail vehicle posted the following:[8]

> I'm about 900 miles from my home base and I have three open, unresolved recalls on my transit. I've talked to the local dealership service department, and they say there are no fixes for any of the recalls, and there is no known timeline. I'm experiencing tire rubbing (tire clearance) when breaking and turning right, but there is no damage or scuffing to the tire. Basically I've temporarily "solved" it by distributing everything to the rear. Just avoid going around curves while traveling downhill, am I right?

79. The dealership I purchased the van from says every van from one plant is having these recall issues.

> At this point, I'm not really sure what to do about it. A van parked in a family

[7] https://www.facebook.com/groups/1178097153059804/posts/1482708335932016/
[8] https://www.reddit.com/r/Ford/comments/1f534pp/ford_transit_trail_2023_recall/

driveway, waiting for some answers, isn't much of a van.

80. On fordtransitusaforum.com, a consumer of a 2023 Ford Transit Trail vehicle posted the following:[9]

> There ain't no way snow chains would work. My guess is this van will get bought back by the factory. I am definitely starting to have buyers remorse. This has been a miserable buying experience. I basically waited 16 months to get an overpriced van that is poorly engineered and borderline undriveable. Way to go Ford!

81. On fordtransitusaforum.com, a consumer of a Ford Transit Trail vehicle posted the following:[10]

> I've had this tire rub when turning into parking lot drives from the street and a brisk manner... just though "oh well, guess I'll drive a little slower" but it'd be nice if they fixed it and I didn't have to modify my driving habits.

82. On fordtransitusaforum.com, a consumer of a Ford Transit Trail vehicle posted the following:[11]

> so frustration working with FordPro and Local dealer on this for months and they keep sending me emails and texts as they are "still investigating" this as recent as 2 days ago and Ford already working on the recall.... This company can't communicate effectively. I wish they would offer to buy back my vehicle and just move on to a Sprinter.. My concern if they didnt get this basic engineering concept right AND we know they dont know how to fill up your axle oil... what ELSE is going to go wrong at 50, 60k miles while we are out in the boondocks...

83. Additionally, Ford should have learned of this widespread Defect from the many reports received from dealerships and from customer complaints directly to Ford, as those reported by Plaintiffs. Ford's customer relations and technical service departments collect and analyze field data including, but not limited to, repair requests made at dealerships, technical reports prepared by engineers who have reviewed vehicles for which warranty coverage is being requested, parts sales reports, and warranty claims data. Discovery will also show that Ford received many

---

[9] https://www.fordtransitusaforum.com/threads/2023-transit-trail-tire-rub.97807/

[10] https://www.fordtransitusaforum.com/threads/transit-trail-recall-24s21-for-tire-rub-update.98964/?post_id=1291086#post-1291086

[11] https://www.fordtransitusaforum.com/threads/transit-trail-recall-24s21-for-tire-rub-update.98964/?post_id=1291086#post-1291086

complaints about the insufficient clearance and tire rub issues. The investigation or testing Ford would have done in response to these many complaints would have also confirmed the Defect.

84. Defendant's warranty department similarly analyzes and collects data submitted by its dealerships to identify trends in its vehicles. It is Defendant's policy that when a repair is made under warranty the dealership must provide Ford with detailed documentation of the problem and the fix employed to correct it. Dealerships have an incentive to provide detailed information to Ford, because they will not be reimbursed for any repairs unless the justification is sufficiently detailed.

85. Ford service centers, independent repair shops, and consumers doing repairs themselves use Ford replacement parts that they order directly from Ford. Thus, Ford would have detailed and accurate data regarding the number and frequency of replacement part orders, information which is also exclusively within Ford's control and unavailable to Plaintiffs without discovery. The ongoing high sales of replacement wheel arch liner and tires was certainly known to Ford and should have alerted Ford that its Class Vehicles were suffering from the Defect.

86. The existence of the Defect is a material fact that a reasonable consumer would consider when deciding whether to purchase or lease a Class Vehicle. Had Plaintiffs and other Class Members known of the Defect, they would have paid less for the Class Vehicles or would not have purchased or leased them.

87. Irrespective of all the aggregate information, both internal and external, that clearly provided Ford with knowledge that the insufficient clearance and wheel arch liner issues render the Class Vehicles dangerously defective, Ford has never disclosed to owners or prospective purchasers that there is a safety defect in the Class Vehicles. In fact, Ford intentionally and actively concealed the existence of a safety defect in the Class Vehicles.

88. Reasonable consumers, like Plaintiffs, reasonably expect that a vehicle is safe, will function in a manner that will not pose a safety hazard, and is free from material defects which affect the Class Vehicles advertised ability to provide off-road capabilities. Plaintiffs and Class Members further reasonably expect that Ford will not sell or lease vehicles with known safety

defects, such as the Defect, and will disclose any such defects to its consumers when it learns of them. They did not expect Ford to fail to disclose the Defect to them and to continually deny the defect existed.

**C. The Recall and Other Communications**

89. Beginning on January 25, 2024, Ford initiated an investigation into complaints of "front tire contact to the wheel arch liner on 2023-2024 model year Transit vehicles equipped with the Transit Trail equipment package."[12] Furthermore,

> In February 2024, Ford Engineering confirmed a rub condition between the front tires and the front wheel arch liners on a Transit vehicle equipped with the Transit Trail equipment package. Ford Engineering demonstrated that the shoulder area of the front tires can contact the wheel arch liners at 60% of full turn while braking, when the vehicle is loaded at or near the vehicle's Front Gross Axle Weight Rating (FGAWR).[13]

90. Despite this knowledge, Ford continued to fail to disclose material facts regarding the Defect. For example, amid this investigation and these findings, Ford delivered Plaintiff Provo's vehicle to her on February 20, 2024.

91. As a result of this investigation, Ford was forced to initiate Recall 24S21, notifying Class Members in April 2024 that "a defect which relates to motor vehicle safety exists in certain 2023-2024 Model Year Transit vehicles equipped with the Trail Package."[14] Specifically, Ford told Class Members, "On your vehicle, the front tire may contact the wheel arch liner during a braking event while turning when the vehicle is loaded at or near the Front Gross Axle Weight Rating (FGAWR)." Moreover, Ford notified Class Members that a "risk" existed of "[r]epeated contact of a front tire with the wheel arch liner and body flange may lead to rapid air loss and tread-belt separation, which can result in a loss of vehicle control and increase the risk of a crash."[15]

---

[12] NHTSA Part 573 Safety Recall Report 24V-226, https://static.nhtsa.gov/odi/rcl/2024/RCLRPT-24V226-1506.PDF (last accessed February 25, 2025).
[13] Id.
[14] Available at https://static.nhtsa.gov/odi/rcl/2024/RIONL-24V226-5689.pdf (last accessed April 30, 2025)
[15] Id.

92. Ford's Tire Recall attempts to correct the Defect by replacing the 30.5-inch 245/75R16 Goodyear Wrangler Workhorse AT tires with 28-inch tires of an unspecified type and origin. The replacement tires are the smaller tires that are equipped on regular, non-Trail Ford Transit. The change to smaller tires reduces the vehicle's ground clearance from 6.7 inches to 5.5 inches, rendering the vehicles unfit for off road driving.

93. In sum, the Tire Recall primarily consists of Ford removing the 30.5-inch 245/75R16 Goodyear Wrangler Workhorse AT tires replacing them with 28.5-inch Goodyear 235/65R16C tires. This "repair," in turn, lowers the ground clearance of the vehicle, defeating the purpose of Class Members' purchase of an off-road capable vehicle. For Class Members who choose to have the recall performed, Ford does not allow them to keep possession of their 30.5-inch tires. Class Members have not been offered any compensation for the failure of the Ford Transit trail package in their Class Vehicles, for which they specifically bargained and paid, such that their Class Vehicles were not off-road capable as they were represented.

94. Although Ford promised off-road capable vehicles suitable for camping and other adventurous purposes, Ford's Tire Recall removes the primary benefit of the Transit "Trail" models—the superior, 30.5-inch tires and superior ground clearance. Accordingly, aside from their lifted frames and suspension, Class Members having the recall performed are left with vehicles closer to the less expensive Ford Transit base model than the Transit Trail.

95. Nor is this the only recall on the Class Vehicles, which have been subjected to as many as 13 different recalls. One in particular, caused by insufficient rear axle lubricant fill volume, resulted in the rear axle pinion bearing being insufficiently lubricated.[16] This manufacturing defect is emblematic of the poor build quality of the Class Vehicles.

96. Another was announced in July 2024, but parts were not made available until January 2025. This recall on certain 2023-2024 Transit Trail acknowledged that:

> the Electronic Power Assisted Steering (EPAS) ground cable eyelet's substrate is exposed to environmental conditions and is susceptible to corrosion. This may

[16] *See* https://static.nhtsa.gov/odi/rcl/2024/RCLRPT-24V102-8750.pdf

> result in an intermittent or complete loss of power to the EPAS motor and Power Steering Control Module (PSCM). An intermittent or complete loss of power to the EPAS motor and PSCM may result in a loss of power steering assist, and may increase the risk of a crash.[17]

This separate issue with the Class Vehicles was serious enough that the recall directed dealerships to "arrange to pick up the owner's vehicle and drive it to the dealership for repairs" and to "re-deliver the owner's vehicle after repairs have been completed."[18] This was yet another piece of equipment installed only on the Class Vehicles that was insufficient for off-roading purposes.

## V. Ford Has Actively Concealed the Defect

97. Despite its knowledge of the Defect in the Class Vehicles, Ford actively concealed the existence and nature of the Defect from Plaintiffs and Class Members. Specifically, Ford failed to disclose or actively concealed at and after the time of purchase, lease, repair, or recall:

a. any and all known material defects or material nonconformity of the Class Vehicles, including that removing the tires and lowering the vehicle effectively removes most of the vehicles' off-road capability; and

b. that the Class Vehicles were not in good working order, were defective, and were not fit for their intended purposes.

98. As discussed above, Ford monitors its customers' discussions on online forums, and actively concealed the Defect by denying the existence of a Defect and blaming the class members for unusual driving. Moreover, as discussed above, Ford failed to disclose that its Tire Recall renders the vehicles unsuitable and unfit for off-road driving.

99. In particular, despite knowing of the existence of the Defect, Ford has refused to inform Class Members that their Class Vehicles are incapable of off-roading in the manner that

---

[17] *See* https://static.nhtsa.gov/odi/rcl/2024/RCMN-24V542-5274.pdf
[18] *Id.*

Ford advertised and in which the Class Members intended. If Ford had been truthful with prospective customers about the Defect, and specifically that Ford did not design or test the Class Vehicles sufficiently before rushing them to market, customers could have made choices that were in their own best interest including: 1) not purchasing the vehicle; 2) purchasing the vehicle for less; or 3) making their own modifications to the vehicles to ensure they were worthy of off-roading. However, consumers were unable to make rational choices because Ford suppressed the information about Defect.

100. When consumers present their Class Vehicles to an authorized Ford dealer for diagnosis, repair, or to receive the recall repair, Ford instructs dealerships to remove the larger tires and replace them with smaller ones, which lowers the vehicle height. As such, key features of the Class Vehicles are removed, and Class Members have paid for vehicle features which no longer exist.

101. In its Recall, Ford took pains to minimize the extent of the Defect, suggesting that the Defect and its repair would not materially change the capabilities of the Class Vehicles and concealing the fact that after applying the Recall, the vehicles would not be suitable for off-road driving.

102. Accordingly, despite Ford's knowledge of Defect, Ford has caused Class Members to expend money at its dealerships to repair the Class Vehicles' and/or to overpay for Class Vehicles which are not suitable for their intended purpose of off-road driving.

## VI. Ford Unjustly Retained Substantial Benefits

103. Ford unlawfully failed to disclose the Defect to induce them and other putative Class Members to purchase or lease the Class Vehicles.

104. Plaintiffs further allege that Ford thus engaged in deceptive acts or practices pertaining to all transactions involving the Class Vehicles.

105. Specifically, Plaintiffs purchased their vehicles and/or parts needed to attempt repairs to their vehicles from Ford authorized dealerships. Those dealerships purchased those vehicles and/or components from Ford.

106. As discussed above therefore, Plaintiffs allege that Ford unlawfully induced them to purchase their respective Class Vehicles and/or components for their Class Vehicles by concealing and/or omitting a material fact (the Defect) and that Plaintiffs would have paid less for the Class Vehicles, or not purchased them at all, had they known of the Defect.

107. Accordingly, Ford's ill-gotten gains, benefits accrued in the form of increased sales and profits resulting from the material concealment and omissions that did - and likely will continue to - deceive consumers, should be disgorged.

## VII. The Agency Relationship Between Ford and its Network of Authorized Dealerships

108. Defendant enters into agreements with its nationwide network of authorized dealerships to fulfill Defendant's obligations under the warranties it provides directly to consumers as well as to provide repairs under recalls. These agreements require a dealership to follow the rules and policies of Ford in all aspects of diagnosing, repairing, maintaining, and servicing Ford vehicles, as well as selling only Ford-approved parts for the vehicles, for reimbursement by Ford.

109. Because Plaintiffs and members of the Class are third-party beneficiaries of the manufacturer-dealership agreements which create the implied warranty, they may avail themselves of the implied warranty and they may seek warranty and recall services locally at dealerships. This is true because third-party beneficiaries to contracts between automobile manufacturers and authorized dealerships that create an implied warranty of merchantability may avail themselves of the implied warranty. *See In re Toyota Motor Corp. Unintended Acceleration Mktg., Sales Practices, & Prod. Liab. Litig.*, 754 F. Supp. 2d 1145, 1185 (C.D. Cal. 2010).

110. Further, Plaintiffs and each of the members of the Class are the intended beneficiaries of Defendant's express and implied warranties. The dealers were not intended to be the ultimate consumers of the Class Vehicles, and they have no rights under the warranty

agreements provided by Defendant. Defendant's warranties were designed for and intended to benefit the consumers only. The consumers are the true intended beneficiaries of Defendant's express and implied warranties, and the consumers may therefore avail themselves of those warranties.

111. Defendant issued the express warranties to the Plaintiffs and the Class members. Defendant also developed and disseminated the owner's manual and warranty booklets, advertisements, and other promotional materials relating to the Class Vehicles. Defendant also is responsible for the content of the Moroney Stickers on Defendant-branded vehicles.

112. In repairing Ford-branded vehicles, Defendant acts through numerous authorized dealers who act, and represent themselves to the public, as exclusive Defendant representatives and agents. That the dealers act as Defendant's agents is demonstrated by the following facts:

113. The authorized Ford dealerships complete all service and repair according to Defendant's instructions, which Defendant issues to its authorized dealerships through service manuals, technical service bulletins ("TSBs"), and other documents, often only accessible via Defendant's proprietary systems and tools, including the Ford diagnostic scan tool referenced on many TSBs such as the Ford Integrated Diagnostic System and Ford J2534 Diagnostic Software:

a. Consumers are able to receive services under Defendant's issued New Vehicle Limited Warranty only at Defendant's authorized dealerships, and they are able to receive these services because of the agreements between Defendant and the authorized dealers. These agreements provide Defendant with a significant amount of control over the actions of the authorized dealerships;

b. The warranties provided by Defendant for the defective vehicles direct consumers to take their vehicles to authorized dealerships for repairs or services;

c. Defendant controls the way in which its authorized dealers can respond to complaints and inquiries concerning defective vehicles, and the dealerships

are able to perform repairs under warranty only with Defendant's authorization;

d. Defendant has entered into agreements and understandings with its authorized dealers pursuant to which it authorizes and exercises substantial control over the operations of its dealers and the dealers' interaction with the public;

e. Defendant implemented its express and implied warranties as they relate to the defects alleged herein by instructing authorized Defendant dealerships to address complaints of the Defect by prescribing and implementing the relevant TSBs cited herein; and

f. Ford's authorized dealerships are able to bind Ford into the terms of the express warranties by selling vehicles to the public, by reviewing the quality of used Ford vehicles and certifying their worthiness to receive Ford's Certified Pre-Owned Warranties.

114. Indeed, Ford's warranty booklets make it abundantly clear that Ford's authorized dealerships are Ford's agents so that consumers may receive repairs from Ford under the warranties it provides directly to consumers such as Plaintiffs. The booklets, which are plainly written for the consumers, not the dealerships, tell the consumers repeatedly to seek repairs and assistance at its "your selling dealer." For example, the booklets state, that "[w]hen you need warranty repairs, your selling dealer would like you to return to it for that service, but you may also take your vehicle to another Ford Motor Company dealership authorized for warranty repairs." The booklets further state that "[y]our Ford or Lincoln dealership, or Ford or Lincoln Auto Care Service Center, has factory-trained technicians who can perform the required maintenance using genuine Ford parts."

115. The booklets further state that "[d]uring the Bumper-to-Bumper Warranty period, dealers may receive instructions to provide no-cost, service-type improvements – not originally included in your Owner's Manual – intended to increase your overall satisfaction with your vehicle." As such, authorized dealerships are not only Ford's agents to perform Ford's promised

services under the warranties provided by Ford directly to the consumer and are Ford's agents to provide "improvements" to Plaintiffs' and Class members' vehicles at Ford's direction.

## TOLLING OF STATUTES OF LIMITATIONS

116. Any applicable statute of limitations has been tolled by Defendant's knowing and active concealment of the Defect and misrepresentations and omissions alleged herein. Through no fault or lack of diligence, Plaintiffs and members of the Class were deceived regarding the Class Vehicles and could not reasonably discover the Defect or Defendant's deception with respect to the Defect. Defendant and its agents continue to deny the existence and extent of the Defect, even when questioned by Plaintiffs and members of the Class.

117. Plaintiffs and members of the Class did not discover and did not know of any facts that would have caused a reasonable person to suspect that the Defendant was concealing a defect and/or the Class Vehicles were defective and possessed a corresponding safety risk. As alleged herein, the existence of the Defect was material to Plaintiffs and members of the Class at all relevant times. Within the time period of any applicable statutes of limitations, Plaintiffs and members of the Class could not have discovered through the exercise of reasonable diligence the existence of the Defect or that the Defendant was concealing the Defect.

118. At all times, Defendant is and was under a continuous duty to disclose to Plaintiffs and members of the Class the true standard, quality, and grade of the Class Vehicles and to disclose the Defect and corresponding safety risk due to their exclusive and superior knowledge of the existence and extent of the Defect in Class Vehicles.

119. Defendant knowingly, actively, and affirmatively concealed the facts alleged herein. Plaintiffs and members of the Class reasonably relied on Defendant's knowing, active, and affirmative concealment.

120. For these reasons, all applicable statutes of limitation have been tolled based on the discovery rule and Defendant's fraudulent concealment, and Defendant is estopped from relying on any statutes of limitations in defense of this action.

## EQUITABLE RELIEF IS NECESSARY

121. Recourse to the equitable powers of the Court, and relief in equity, is necessary here to provide full and complete relief to Class Members. This is particularly true because Ford's recall may provide some relief but fails to provide all the relief necessary to make consumers whole, and legal remedies are also inadequate.

122. First, Plaintiffs, on behalf of themselves and the Class Members, seek equitable relief in this matter in the form of prospective injunctive relief.

123. Plaintiffs seek an injunction requiring Ford to provide fulsome and comprehensive notice to each Class Member regarding the existence of the Defect in their vehicles, Ford's knowledge thereof, the attendant risks to vehicle componentry, the attendant safety concerns and risks, and the availability of any relief available.

124. To that end, Plaintiffs seek an injunction requiring Ford to acquire the contact information, including addresses for direct mail notice, associated with each Class Vehicle's VIN number, from the Departments of Motor Vehicles of the fifty states, which is done routinely in connection with class certification in automotive defect cases, and to send direct-mail notice containing the above-referenced disclosures to each Class Member, including current owners or lessees, former owners or lessees, and former owners/lessees who disposed of their vehicles due to the existence of the Defect.

125. Unless ordered by this Court and supervised by putative Class Counsel, Ford will not provide adequate relief to Class Members. Ford will not acquire the addresses of all Class Members, including current and former owners/lessees, from the Departments of Motor Vehicles of the fifty states. Ford will not send direct mail notice with complete disclosures regarding its knowledge of the Defect, its effect on the vehicles' componentry, and its attendant safety risks.

126. Plaintiffs further seek injunctive relief to require Ford to provide reimbursement for all costs of repair and related costs, such as towing, rental cars, and other costs, and to require such reimbursement claims to be handled by an independent third-party administrator to ensure fairness.

127. Plaintiffs also seek reimbursement for the overpayment for the Class Vehicles by

Class Members represented by the premium Class Members paid for Ford Transit supposedly ready for significant off-road use, which was approximately $12,500 per vehicle for the trim package that modified the standard Ford Transit vehicles into the "Ford Transit Trail" vehicles. But for Ford's misrepresentations about the quality, specifications, and capabilities of the Class Vehicles, Class Members would have either not purchased the vehicles or purchased them for less, i.e. the price of a Ford Transit van that has not yet been lifted or modified to go off-road.

128. Additionally, many Class Members have been without the use of their vehicle for months, while they await repairs. Numerous Class Members who have experienced recent failures have been told by Ford dealers that parts are not available and therefore they have been without a functioning vehicle for weeks or months. The Court can and should exercise its discretion to afford equitable relief to such Class Members. Ford should be required to provide repairs within a reasonable time, provide rental car reimbursement, or provide other relief that fairness requires.

129. Legal remedies are inadequate to obtain the above-referenced outcomes, including fulsome and complete notice to all Class Members, including notice of the Defect's safety risks. Nor are legal remedies adequate to compel Ford to devise a prompt, complete, and effective fix that can be applied to each Class Vehicle such that the Class Vehicles are safe for their intended off-road use. Nor are legal remedies equally as prompt, certain, and in other ways efficient to provide notice to the Class Members and a fulsome and prompt fix to their vehicles.

130. Likewise, Plaintiffs seek equitable relief in the form of restitution. As with the injunctive relief discussed *supra*, legal remedies are likewise inadequate and are not as equally prompt, certain, and in other ways efficient as restitution under California's Unfair Competition Law. For example, the legal remedies available to Plaintiffs for their common law fraud claims may require that Plaintiffs to prove intent to deceive, an element not required for Plaintiffs to recover restitution under their California Unfair Competition Law claims.

131. Similarly, the legal remedies available to Plaintiffs for their common law fraud claims are likewise inadequate and are not as equally prompt, certain, and in other ways efficient as restitution under California's Unfair Competition Law. To prevail on their Common Law Fraud

claims, Plaintiffs may need to show intent and actual reliance, as well as exceptions to the economic loss doctrine under the laws of various states. Such elements are not required for Plaintiffs to recover restitution under their California Unfair Competition Law claims.

## CLASS ACTION ALLEGATIONS

132. This action is brought and may be maintained as a class action, pursuant to Rule 23(a), (b)(2), (b)(3), and/or (c)(4) of the Federal Rule of Civil Procedure.

133. The Nationwide Class is defined as follows:

> **Class**: All persons in the United States who bought or leased, other than for resale, any Ford Transit Trail vehicle model year 2023 or 2024 ("Class Vehicles").

134. In addition, or in the alternative, State Subclasses are defined as follows:

> **Minnesota Subclass**
>
> All individuals who purchased or leased, other than for resale, any Class Vehicle in the State of Minnesota.
>
> **Missouri Subclass**
>
> All individuals who purchased or leased, other than for resale, any Class Vehicle in the State of Missouri.

135. Excluded from the Class are Ford, its affiliates, employees, officers and directors; persons or entities that purchased the Class Vehicles for resale; and the Judge(s) assigned to this case. Plaintiff reserves the right to modify, change, or expand the class definitions in light of discovery and/or further investigation.

136. **Numerosity**: The Class is so numerous that joinder of all members is impracticable. While the exact number and identities of individual members of the Class is unknown at this time, as such information is in the sole possession of Ford and is obtainable by Plaintiffs only through the discovery process, Plaintiffs believe, and on that basis alleges, that at least two thousands Class Vehicles have been sold and leased nationwide and in each of the states where Plaintiffs reside. Members of the Class can be readily identified and notified based upon, *inter alia*, the records

(including databases, e-mails, and dealership records and files) maintained by Ford in connection with its sales and leases of Class Vehicles.

137. **Existence and Predominance of Common Questions of Fact and Law**: Common questions of law and fact exist as to all members of the Class. These questions predominate over the questions affecting individual Class Members. These common legal and factual questions include, but are not limited to:

a. whether Ford engaged in the conduct alleged herein;

b. whether Class Vehicles are defective;

c. whether Ford placed Class Vehicles into the stream of commerce in the United States with knowledge of the Defect;

d. whether Ford knew or should have known of the Defect, and if so, for how long;

e. when Ford became aware of the Defect in the Class Vehicles;

f. whether Ford knowingly failed to disclose the existence and cause of the Defect in the Class Vehicles;

g. whether Ford's conduct alleged herein violates consumer protection laws, warranty laws, and other laws as asserted herein;

h. whether Plaintiffs and Class Members overpaid for their Class Vehicles as a result of the Defect;

i. whether Plaintiffs and Class Members have suffered an ascertainable loss as a result of their loss of their Class Vehicles' features and functionality;

j. whether Plaintiffs and Class Members are entitled to damages, including punitive damages, as a result of Ford's conduct alleged herein, and if so, the amount or proper measure of those damages; and

k. whether Plaintiffs and Class Members are entitled to equitable relief, including but not limited to restitution and/or injunctive relief.

138. **Typicality**: Plaintiffs' claims are typical of the claims of the Class because each Plaintiff purchased or leased a Class Vehicle containing the Defect, as did each member of the Class. Plaintiffs and Class Members were economically injured in the same manner by Ford's uniform course of conduct alleged herein. Plaintiffs and Class Members have the same or similar claims against Ford relating to the conduct alleged herein, and the same conduct on the part of Ford gives rise to all the claims for relief.

139. **Adequacy**: Plaintiffs are adequate representatives of the Class, whose interests do not conflict with those of any other Class Member. Plaintiffs have retained counsel competent and experienced in complex class action litigation—including consumer fraud and automobile defect class actions—who intend to prosecute this action vigorously. The interests of the Class will be fairly and adequately protected by Plaintiffs and their counsel.

140. **Superiority**: A class action is superior to all other available means of fair and efficient adjudication of the claims of Plaintiffs and members of the Class. The injury suffered by each individual Class Member is relatively small in comparison to the burden and expense of individual prosecution of these claims, including from the need for expert witness testimony on the technical and economic aspects of the case. Individualized litigation also would risk inconsistent or contradictory judgments and increase the delay and expense to all parties and the courts. By contrast, a class action presents far fewer management difficulties and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court.

141. **Injunctive Relief**: Ford has acted, and refuses to act, on grounds generally applicable to the Class, thereby making appropriate final equitable relief with respect to the Class as a whole.

## CLAIMS FOR RELIEF

**Claims on Behalf of the Minnesota Subclass**

### COUNT I

**Breach of Implied Warranty of Merchantability**
**MINN. STAT. §§ 336.2-31, 336.2-315, 336.2A-103, AND 336.2A-212**
**Plaintiff Provo, Individually and on Behalf of the Minnesota Subclass**

142. Plaintiffs incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

143. Plaintiff Provo brings this cause of action individually and on behalf of the members of the Minnesota Subclass.

144. Ford is and was at all relevant times a "merchant" with respect to motor vehicles under Minn. Stat. § 336.2-104(1) and a "seller" of motor vehicles under § 336.2-103(1)(d).

145. With respect to leases, Ford is and was at all relevant times "lessors" of motor vehicles under Minn. Stat. § 336.2A-103(1)(p).

146. The Class Vehicles are and were at all relevant times "goods" within the meaning of Minn. Stat. § 336.2-105(1) and § 336.2A-103(1)(h).

147. A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law under Minn. Stat. § 336.2-314 and § 336.2A-212.

148. In addition, a warranty that the Class Vehicles were fir for their particular purpose is implied by law pursuant to Minn. Stat. § 336.2-315.

149. Ford knew or had reason to know of the specific use for which the Class Vehicles were purchased or leased. Ford directly sold and marketed the Class Vehicles to customers through authorized dealers, like those from whom Plaintiff Provo and the Minnesota Subclass Members bought or leased their vehicles, for the intended purpose of consumers purchasing the vehicles. Ford knew that the Class Vehicles would and did pass unchanged from Ford to the authorized dealers to Plaintiff Provo and the Minnesota Subclass Members, with no modification to the

defective tires.

150. Ford provided Plaintiff and Class Members with an implied warranty that the Class Vehicles and their components and parts are merchantable and fit for the ordinary purposes for which they were sold.

151. This implied warranty included, among other things: (i) a warranty that the Class Vehicles and their tires that were manufactured, supplied, distributed, and/or sold by Ford were safe and reliable for providing transportation; and (ii) a warranty that the Class Vehicles and their tires would be fit for their intended use while the Class Vehicles were being operated.

152. Contrary to the applicable implied warranties, the Class Vehicles at the time of sale and thereafter were not fit for their ordinary and intended purpose of providing Plaintiff Provo and Class Members with reliable, durable, and safe transportation. Instead, the Class Vehicles are defective, including, but not limited to, the defective design and manufacture of their tires and the existence of the Defect at the time of sale or lease and thereafter. Ford knew of this defect at the time these sale or lease transactions occurred.

153. As a result of Ford's breach of the applicable implied warranties, Plaintiff Provo and the Minnesota Subclass Members suffered an ascertainable loss of money, property, and/or value of their Class Vehicles. Additionally, because of the Defect, Plaintiff Provo and the Minnesota Subclass Members were harmed and suffered actual damages in that the Class Vehicles' tire components are substantially certain to fail before their expected useful life has run.

154. Ford's actions, as complained of herein, breached the implied warranty that the Class Vehicles were of merchantable quality and fit for such use in violation of Minn. Stat. §§ 336.2-314 and 336.2A-212.

155. Plaintiff Provo and the Minnesota Subclass Members have complied with all obligations under the warranty, or otherwise have been excused from performance of said obligations because of Ford's conduct described herein.

156. Plaintiff Provo and the Minnesota Subclass Members were not required to notify Ford of the breach because affording Ford a reasonable opportunity to cure its breach of implied

warranty would have been futile. Ford was also on notice of the Defect from the complaints and service requests it received from Plaintiff and the Class Members, from repairs and/or replacements of the tires or components thereof, and through other internal sources.

157. Minnesota Plaintiff also provided notice to Ford of its breach of express warranty by letter dated September 6, 2024.

158. Because Plaintiff Provo and the Minnesota Subclass Members purchased their vehicles from authorized Ford dealers, they are in privity with Ford since (1) an agency relationship establishes privity for purposes of the breach of implied warranty claims and (2) privity is not required where plaintiffs are intended third-party beneficiaries of a defendant's implied warranties and of the contracts between Ford and its authorized dealers.

159. As a direct and proximate cause of Ford's breach, Plaintiff Provo and the Minnesota Subclass Members suffered damages and continue to suffer damages, including economic damages at the point of sale or lease and diminution of value of their Class Vehicles. Additionally, Plaintiff Provo and the Minnesota Subclass Members have incurred or will incur economic damages at the point of repair in the form of the cost of repair.

160. As a direct and proximate result of Ford's breach of the implied warranty of merchantability, Plaintiff Provo and the Minnesota Subclass Members have been damaged in an amount to be proven at trial.

## COUNT II

**Violation of Minnesota Uniform Deceptive Trade Practices Act**
**Minn. Stat. § 325D.43-48, *et seq.***
**Plaintiff Provo Individually, and on Behalf of the Minnesota Subclass**

161. Plaintiffs incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

162. Plaintiff Provo brings this claim on behalf of the Minnesota Subclass.

163. Plaintiff Provo, the Minnesota Subclass members, and Ford is a "persons"" within the meaning of Minn. Stat. § 325D.44.

164. The Class Vehicles and defective tires are "goods" within the meaning of Minn. Stat. § 325D.44.

165. The Minnesota Deceptive Trade Practices Act ("Minnesota DTPA") prohibits deceptive trade practices, which occur when a person "(5) represents that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have or that a person has a sponsorship, approval, status, affiliation, or connection that the person does not have"; "(7) represents that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another"; and "(9) advertises goods or services with intent not to sell them as advertised." Minn. Stat. § 325D.44.

166. Ford's acts and practices, described herein, are unfair in violation of Minnesota law because it violates Minnesota public policy and warranty laws requiring a manufacturer to ensure that goods it places on the market are fit for their ordinary and intended purposes.

167. Ford acted in an unethical, unscrupulous, outrageous, oppressive, and substantially injurious manner, in at least the following respects:

a. promoted and sold or leased Class Vehicles it knew were defective;

b. failed to disclose the Defect, and represented through advertising and the Class Vehicles possess particular qualities that were inconsistent with Ford's actual knowledge of them;

c. failed to make repairs or made repairs and provided replacements that caused Plaintiff and the Minnesota Subclass members to experience repeated instances of failure, rendering the New Vehicle Limited Warranty useless; and

d. minimized the scope and severity of the problems with the Class Vehicles, refusing to acknowledge that they are defective, and failing to provide adequate relief to consumers.

168. The gravity of harm resulting from Ford's unfair conduct outweighs any potential utility. The practice of selling and leasing defective Class Vehicles without providing an adequate

remedy to cure the defect harms the public at large and is part of a common and uniform course of wrongful conduct.

169. The harm from Ford's conduct was not reasonably avoidable by consumers. Even after receiving a large volume of consumer complaints, Ford did not disclose the Defect. Plaintiff Provo and Minnesota Subclass members did not know of, and had no reasonable means of discovering, that Class Vehicles are defective.

170. Ford also engaged in deceptive trade practices in violation of Minnesota law, by promoting the safety, convenience, and operability of Class Vehicles while willfully failing to disclose and actively concealing their defective nature.

171. Ford committed deceptive acts and practices with the intent that consumers, such as Plaintiff Provo and Minnesota Subclass members, would rely upon Ford's representations and omissions when deciding whether to purchase or lease a Class Vehicle.

172. Plaintiff Provo and Minnesota Subclass members suffered ascertainable loss as a direct and proximate result of Ford's unfair and deceptive acts or practices. Had Plaintiff Provo and the Minnesota Subclass members known that the Class Vehicles are equipped with tires containing the Defect, they would not have purchased and leased the Class Vehicles or would have paid significantly less for them. Among other injuries, they overpaid for their Class Vehicles, and their Class Vehicles suffered a diminution in value.

173. Plaintiff Provo and the Minnesota Subclass members are entitled to recover their actual damages under Minn. Stat. § 8.31(3a) and reasonable attorneys' fees under Minn. Stat. § 325D.45.

174. Plaintiff Provo also seeks an order enjoining Ford's unfair and deceptive acts or practices pursuant to Minn. Stat. § 549.20(1)(a), and any other just and proper relief available under the Minnesota DTPA.

## COUNT IIIII

**Violation of Minnesota Prevention of Consumer Fraud Act**
**MINN. STAT. § 325F.68, *ET SEQ.***
**Plaintiff Provo, Individually and on Behalf of the Minnesota Subclass**

175. Plaintiffs incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

176. Plaintiff Provo brings this claim on behalf of the Minnesota Subclass.

177. Defendant, Minnesota Plaintiff and the Minnesota Subclass members are "person[s]" within the meaning of within the meaning of Minn. Stat. § 325F.68.

178. The Class Vehicles and defective tires are "merchandise" within the meaning of Minn. Stat. § 325F.68(2).

179. The Minnesota Prevention of Consumer Fraud Act ("Minnesota CFA") prohibits [t]he act, use, or employment by any person of any fraud, false pretense, false promise, misrepresentation, misleading statement or deceptive practice, with the intent that others rely thereon in connection with the sale of any merchandise, whether or not any person has in fact been misled, deceived or damaged thereby…" Minn. Stat. § 325F.69(1). Ford participated in misleading, false or deceptive acts that violated the Minnesota CFA.

180. In the course of their business, Ford concealed, suppressed and omitted material facts concerning the Class Vehicles, the inherent Defect they contained, and the corresponding dangers and risks posed by the Class Vehicles, as described above and otherwise engaged in activities with a tendency or capacity to deceive.

181. In violation of the Minnesota CFA, Defendant employed unfair and deceptive acts or practices, fraud, false pretense, misrepresentation, or concealment, suppression or omission of material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale and/or lease of Class Vehicles. Defendant knowingly concealed,

suppressed, and omitted material facts regarding the Defect and associated safety hazard and misrepresented the standard, quality, or grade of the Class Vehicles, which directly caused harm to Plaintiff Provo and the members of the Minnesota Subclass.

182. Defendant intentionally and knowingly misrepresented material facts and omitted material facts regarding the Class Vehicles and the Defect present in them with an intent to mislead Plaintiff Provo and the members of the Minnesota Subclass.

183. Defendant knew or should have known that its conduct violated the Minnesota CFA.

184. Defendant made material statements and/or omissions about the safety, reliability, and functionality of the Class Vehicles and/or the defective tires installed in them that were either false or misleading. Defendant's misrepresentations, omissions, statements, and commentary have included selling and marketing Class Vehicles as safe, reliable, and functional, despite their knowing of the Defect and its corresponding safety hazard.

185. To protect their profits, avoid remediation costs and public relation problems, and increase their profits by having consumers pay for any parts and repairs to remedy to the Defect, Defendant concealed the defective nature and safety risk posed by the Class Vehicles and existing Defect at the time of sale or lease. Defendant allowed unsuspecting new and used car purchasers and lessees to continue to buy or lease the Class Vehicles and continue to drive them, despite the safety risk they pose.

186. Defendant owed Plaintiff Provo and the members of the Minnesota Subclass a duty to disclose the true safety, reliability, or functionality of the Class Vehicles and the existence of the Defect because Defendant:

a. Possessed exclusive knowledge of the Defect and its associated safety

hazard;

b. Intentionally concealed the foregoing from Plaintiff Provo and the members of the Minnesota Subclass; and/or

c. Made incomplete representations about the safety and reliability of the foregoing generally, while purposefully withholding material facts from Plaintiff Provo and members of the Minnesota Subclass that contradicted these representations, *inter alia*, that the Defect existed at the time of sale or lease which causes the Class Vehicles' tires to rub against the wheel arch liners, causing them to fail to perform their essential purpose of driving off "trail," and which may lead to rapid air loss and tread-belt separation, which can result in a loss of vehicle control and increase the risk of a crash in their Class Vehicles also causing them to fail their essential purpose.

187. Because Defendant and its authorized agents to perform repairs fraudulently concealed the Defect in the Class Vehicles, by denying the existence of the Defect and/or pretending to fix the symptoms of the Defect, and now that the Defect has been discovered, the value of the Class Vehicles has greatly diminished, and they are now worth significantly less than they otherwise would be. Further, Plaintiff Provo and the members of the Minnesota Subclass were deprived of the benefit of the bargain they reached at the time of purchase or lease.

188. Defendant's failure to disclose and active concealment of the Defect in the Class Vehicles were material to Plaintiff Provo and the members of the Minnesota Subclass. But for Defendant's actions, Plaintiff Provo and members of the Minnesota Subclass would not have purchased and/or leased their Class Vehicles or would have paid less for them.

189. Plaintiff Provo and the Minnesota Subclass suffered ascertainable losses caused by

Ford's misrepresentations and their failure to disclose material information. Had Plaintiff Provo and the members of the Minnesota Subclass been aware of the Defect that existed in the Class Vehicles and Defendant's complete disregard for the safety of its consumers, Plaintiff Provo and the members of the Minnesota Subclass would not have paid as much for their vehicles or would not have purchased or leased them at all. Plaintiff Provo and the members of the Minnesota Subclass did not receive the benefit of their bargain because of Defendant's misconduct.

190. Plaintiff Provo and the members of the Minnesota Subclass risk loss of use of their vehicles because of Defendant's acts and omissions in violation of the Minnesota CFA, and these violations present a continuing risk to Plaintiff Provo, the Minnesota Subclass and the public in general.

191. As a direct and proximate result of Defendant's violations of the Minnesota CFA, Plaintiff Provo and the members of the Minnesota Subclass have injury-in-fact and/or actual damage.

192. Pursuant to Minn. Stat. § 8.31(3a), Plaintiff Provo and the members of the Minnesota Subclass seek actual damages, attorneys' fees, and any other just and proper relief available under the Minnesota CFA.

193. Plaintiff Provo and the members of the Minnesota Subclass also seek punitive damages under Minn. Stat. § 549.20(1)(a) given the clear and convincing evidence that Ford showed deliberate disregard for the rights or safety or others.

**Claims on Behalf of the Missouri Subclass**

**COUNT IV**

**Breach of Implied Warranty of Merchantability**
**Mo. Rev. Stat. § 400.2-314 and § 400.2A-212**
**Plaintiff Cherwa, Individually and on Behalf of the Missouri Subclass**

194. Plaintiffs incorporate by reference and re-allege the allegations contained in the

preceding paragraphs of this complaint, as though fully set forth herein.

195. Plaintiff Cherwa brings this cause of action individually and on behalf of the members of the Missouri Subclass.

196. Ford is and was at all relevant times a "merchant" with respect to motor vehicles under Mo. Rev. Stat. § 400.2-104(1) and a "seller" of motor vehicles under § 400.2-314.

197. With respect to leases, Ford is and was at all relevant times a "lessor" with respect to motor vehicles under Mo. Rev. Stat. § 400.2A-103(1)(p) and § 400.2A-212.

198. The Class Vehicles are and were at all relevant times "goods" within the meaning of Mo. Rev. Stat. § 400.2-105(1) and Mo. Stat. § 400.2A-103(1)(h).

199. A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law under Mo. Rev. Stat. § 400.2-314 and § 400.2A-212.

200. Ford knew or had reason to know of the specific use for which the Class Vehicles were purchased or leased. Ford directly sold and marketed vehicles with wheels and tires that did not fit the vehicles and with insufficient clearance to customers through authorized dealers, like those from whom Plaintiff Cherwa and the Missouri Subclass Members bought or leased their vehicles, for the intended purpose of consumers purchasing the vehicles. Ford knew that the Class Vehicles would and did pass unchanged from Ford to the authorized dealers to Plaintiff Cherwa and the Missouri Subclass Members, with no modification to the defective tires.

201. Ford provided Plaintiff Cherwa and Class Members with an implied warranty that the Class Vehicles and their components and parts are merchantable and fit for the ordinary purposes for which they were sold. However, the Class Vehicles are not fit for their ordinary purpose of providing reasonably reliable and safe transportation because, inter alia, the Class Vehicles and their tires suffered from an inherent defect at the time of sale and thereafter and are not fit for their particular purpose of providing safe and reliable transportation.

202. This implied warranty included, among other things: (i) a warranty that the Class Vehicles and their tires that were manufactured, supplied, distributed, and/or sold by Ford were

safe and reliable for providing transportation; and (ii) a warranty that the Class Vehicles and their tires would be fit for their intended use while the Class Vehicles were being operated.

203. Contrary to the applicable implied warranties, the Class Vehicles at the time of sale and thereafter were not fit for their ordinary and intended purpose of providing Plaintiff Cherwa and Class Members with reliable, durable, and safe transportation. Instead, the Class Vehicles were and are defective, including, but not limited to, the defective design and manufacture and the existence of the Defect at the time of sale or lease and thereafter. Ford knew of this defect at the time these sale or lease transactions occurred.

204. As a result of Ford's breach of the applicable implied warranties, Plaintiff Cherwa and the Missouri Subclass Members suffered an ascertainable loss of money, property, and/or value of their Class Vehicles. Additionally, because of the Defect, Plaintiff Cherwa and the Missouri Subclass Members were harmed and suffered actual damages in that the Class Vehicles' tire components are substantially certain to fail before their expected useful life has run.

205. Ford's actions, as complained of herein, breached the implied warranty that the Class Vehicles were of merchantable quality and fit for such use in violation of the Uniform Commercial Code and relevant state law.

206. Plaintiff Cherwa and the Missouri Subclass Members have complied with all obligations under the warranty, or otherwise have been excused from performance of said obligations because of Ford's conduct described herein.

207. Plaintiff Cherwa and the Missouri Subclass Members were not required to notify Ford of the breach because affording Ford a reasonable opportunity to cure its breach of implied warranty would have been futile. Ford was also on notice of the Defect from the complaints and service requests it received from Plaintiff and the Class Members, from repairs and/or replacements of the tires or components thereof, and through other internal sources.

208. Plaintiff Cherwa also provided notice to Ford of its breach of express warranty by letter dated September 6, 2024.

209. As a direct and proximate cause of Ford's breach, Plaintiff Cherwa and the Missouri

Subclass Members suffered damages and continue to suffer damages, including economic damages at the point of sale or lease and diminution of value of their Class Vehicles. Additionally, Plaintiff Cherwa and the Missouri Subclass Members have incurred or will incur economic damages at the point of repair in the form of the cost of repair as well as additional losses.

210. As a direct and proximate result of Ford's breach of the implied warranty of merchantability, Plaintiff Cherwa and the Missouri Subclass Members have been damaged in an amount to be proven at trial.

**COUNT V**

**Violation of Missouri Merchandising Practices Act**
**MO. REV. STAT. § 407.010, *et seq.***
**Plaintiff Cherwa, Individually and on Behalf of the Missouri Subclass**

211. Plaintiffs repeat and re-allege each and every allegation contained in each of the preceding and succeeding paragraphs as fully set forth herein.

212. Plaintiff Cherwa brings this claim individually and on behalf of the members of the Missouri Subclass.

213. Ford, Plaintiff Cherwa, and the Missouri Sub-Class members are "persons" within the meaning of the Missouri Merchandising Practices Act ("Missouri MPA"), Mo. Rev. Stat. § 407.010(5).

214. Ford engaged in "trade" or "commerce" in the State of Missouri within the meaning of Mo. Rev. Stat. § 407.010(7).

215. The Missouri MPA makes unlawful the "act, use or employment by any person of any deception, fraud, false pretense, false promise, misrepresentation, unfair practice or the concealment, suppression, or omission of any material fact in connection with the sale or advertisement of any merchandise." Mo. Rev. Stat. § 407.020. Ford engaged in unlawful trade practices, and unfair or deceptive acts or practices that violated the Missouri MPA.

216. Ford participated in unfair or deceptive trade practices that violated the Missouri MPA. As described below and alleged throughout the Complaint, by failing to disclose the Defect,

by concealing the Defect, by marketing its vehicles as safe, reliable, well-engineered, and of high quality, and by presenting itself as a reputable manufacturer that valued safety, performance and reliability, and stood behind its vehicles after they were sold, Ford knowingly and intentionally misrepresented and omitted material facts in connection with the sale or lease of the Class Vehicles. Ford systematically misrepresented, concealed, suppressed, or omitted material facts relating to the Class Vehicles and the Defect in the course of its business.

217. Ford also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression, or omission, in connection with the sale of the Class Vehicles.

218. Ford's unfair and deceptive acts or practices occurred repeatedly in Ford's trade or business, were capable of deceiving a substantial portion of the purchasing public and imposed a serious safety risk on the public.

219. Ford knew that the Class Vehicles and their tires suffered from an inherent defect, were defectively designed and/or manufactured, and were not suitable for their intended use.

220. Ford knew or should have known that its conduct violated the Missouri MPA.

221. Ford was under a duty to Plaintiff Cherwa and the Missouri Sub-Class Members to disclose the defective nature of the Class Vehicles because:

a. Ford was in a superior position to know the true state of facts about the safety defect in the Class Vehicles;

b. Ford made partial disclosures about the quality of the Class Vehicles without revealing the defective nature of the Class Vehicles; and

c. Ford actively concealed the defective nature of the Class Vehicles from Missouri Plaintiff and the Missouri Sub-Class Members at the time of sale and thereafter.

222. By failing to disclose the Defect, Ford knowingly and intentionally concealed material facts and breached its duty not to do so.

223. The facts concealed or not disclosed by Ford to Missouri Plaintiff and the Missouri Subclass Members are material because a reasonable person would have considered them to be important in deciding whether to purchase or lease Ford's Class Vehicles, or to pay less for them. Had Missouri Plaintiff and the Missouri Subclass Members known that the Class Vehicles suffered from the Defect described herein, they would not have purchased or leased the Class Vehicles or would have paid less for them.

224. Missouri Plaintiff and the Missouri Subclass Members are reasonable consumers who do not expect that their vehicles will suffer from the Defect. That is the reasonable and objective consumer expectation for vehicles.

225. As a result of Ford's misconduct, Missouri Plaintiff and the Missouri Subclass Members have been harmed and have suffered actual damages in that the Class Vehicles are defective and require repairs or replacement.

226. As a direct and proximate result of Ford's unfair or deceptive acts or practices, Missouri Plaintiff and the Missouri Subclass Members have suffered and will continue to suffer actual damages.

227. Ford's violations present a continuing risk to Missouri Plaintiff and the Missouri Subclass Members as well as to the general public. Ford's unlawful acts and practices complained of herein affect the public interest.

228. Plaintiff Cherwa provided notice of her claims, including a written demand for relief, by letter dated September 6, 2024.

229. Ford is liable to Missouri Plaintiff and Missouri Subclass Members for damages in amounts to be proven at trial, including actual damages, attorneys' fees, costs, and punitive damages, as well as injunctive relief enjoining Ford's unfair and deceptive practices, and any other just and proper relief available under Mo. Rev. Stat. § 407.025.

## COUNT VI

**Unjust Enrichment**
**In the Alternative to All Other Claims**
**All Plaintiffs, Individually and on Behalf of the State Subclasses**

230. Plaintiffs incorporate by reference each preceding and succeeding paragraph as though fully set forth herein.

231. Plaintiffs bring this claim, under the laws of their respective home states, individually and on behalf of their respective State Subclasses.

232. This claim is pleaded in the alternative to the other claims set forth herein.

233. As the intended and expected result of its conscious wrongdoing, Ford has profited and benefited from the purchase and lease of Class Vehicles that contain the Defect.

234. In particular, the value of the Class Vehicles was artificially inflated by Ford's concealment of the Defect, and Plaintiffs and Class Members have overpaid for the cars and have been forced to pay other costs.

235. As a result of its wrongful acts, concealments, and omissions of the defect in its Class Vehicles, as set forth above, Ford charged higher prices for their vehicles than the vehicles' true value. Plaintiffs and Class Members paid than higher price for their vehicles to Ford's authorized distributors and dealers, which are in Ford's control and from whom Ford receives monetary benefits.

236. Moreover, Ford continues to profit from its ongoing wrongful behavior by denying the nature and existence of the Defect to Plaintiffs and Class Members during the duration of the Warranties, refusing to honor the Warranties, and selling replacement parts to Plaintiffs and the Class Members.

237. Ford has voluntarily accepted and retained these profits and benefits, knowing that, because of its misconduct alleged herein, Plaintiffs and the Class Members were not receiving Class Vehicles of the quality, nature, fitness, reliability, safety, or value that Ford had represented and that a reasonable consumer would expect. Plaintiffs and the Class Members expected that when they purchased or leased a Class Vehicle, it would not contain a Defect that makes the vehicle unreliable and poses a serious safety risk.

238. Plaintiffs and all Class members were not aware of the true facts about the Class Vehicles and did not benefit from Ford's conduct.

239. Ford has been unjustly enriched by its deceptive, wrongful, and unscrupulous conduct and by its withholding of benefits and monies from Plaintiffs and Class Members rightfully belonging to them.

240. Equity and good conscience militate against permitting Ford to retain these profits and benefits from its wrongful conduct.

241. As a result of the Defendant's unjust enrichment, Plaintiffs and Class Members have suffered damages.

242. Plaintiffs do not seek restitution under their Unjust Enrichment claim. Rather, Plaintiffs and Class Members seek non-restitutionary disgorgement of the financial profits that Defendant obtained because of its unjust conduct.

243. Additionally, Plaintiffs seek injunctive relief to compel Defendant to offer, under warranty, remediation solutions that Defendant identifies. Plaintiffs also seek injunctive relief enjoining Defendant from further deceptive distribution, sales, and lease practices with respect to Class Vehicles, enjoining Defendant from selling the Class Vehicles with the misleading information; compelling Defendant to provide Class members with a replacement components that do not contain the defects alleged herein; and/or compelling Defendant to reform its warranty, in a manner deemed to be appropriate by the Court, to cover the injury alleged and to notify all Class Members that such warranty has been reformed. Money damages are not an adequate remedy for the above requested non-monetary injunctive relief.

## COUNT VII

**Fraud by Omission or Fraudulent Concealment**
**All Plaintiffs, Individually and on Behalf of the Nationwide Class,**
**Or, in the Alternative, on Behalf of All Subclasses**

244. Plaintiffs reallege and incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

245. Plaintiffs bring this cause of action on behalf of themselves and the Nationwide Class against Defendant as there are no true conflicts among the states' laws of fraudulent concealment/omission. Defendant is liable for both fraudulent concealment and non-disclosure, including the resultant fraudulent inducement. *See, e.g.*, Restatement (Second) Torts §§ 550-51 (1977). In alternative, Plaintiffs bring this claim on behalf of each of the State Subclasses, against Defendant.

246. Ford distributed and sold the Class Vehicles in all 50 states. Ford also drafted, distributed, and disseminated the same advertising materials in all 50 states, including on the website it maintains to advertise the Class Vehicles. Those materials omitted any mention of the Defect and its associated safety concerns.

247. Ford also drafted the Monroney Stickers which were affixed to Class Vehicles and contained other safety information about the vehicles, including the safety systems available on the vehicles such as airbags, autonomous braking and other systems, but failed to disclose the Defect and its associated safety concerns.

248. Ford knew that the Class Vehicles suffered from an inherent Defect, were defectively designed and/or manufactured and were not suitable for their intended use.

249. Defendant concealed from and failed to disclose to Plaintiffs and Class Members the defective nature of the Class Vehicles.

250. Defendant was under a duty to Plaintiffs and Class Members to disclose the defective nature of the Class Vehicles because:

251. Defendant was in a superior position to know the true state of facts about the safety defect contained in the Class Vehicles:

a. The omitted facts were material because they directly impact the safety of the Class Vehicles;

b. Defendant knew the omitted facts regarding the Defect were not known to or reasonably discoverable by Plaintiffs and Class Members;

c. Defendant made partial disclosures about the quality of the Class Vehicles without revealing their true defective nature; and,

d. Defendant actively concealed the defective nature of the Class Vehicles from Plaintiffs and Class Members.

252. Ford also had a statutory duty to disclose known safety defects to consumers and NHTSA under federal motor vehicle safety law.

253. The facts concealed or not disclosed by Defendant to Plaintiffs and the other Class Members are material in that a reasonable person would have considered them to be important in deciding whether to purchase or lease Defendant's Class Vehicles or pay a lesser price for them. Whether a Class Vehicle’s insufficient clearance for the wheels and tires can cause premature wear, air loss and tread separation, leading to loss of control of the vehicle, increasing the risk of a crash, is a material safety concern. Had Plaintiffs and Class Members known about the defective nature of the Class Vehicles, they would not have purchased or leased the Class Vehicles or would have paid less for them.

254. Defendant concealed or failed to disclose the true nature of the design and/or manufacturing defects contained in the Class Vehicles to induce Plaintiffs and Class Members to act thereon. Plaintiffs and the other Class Members justifiably relied on Defendant's omissions to their detriment. This detriment is evident from Plaintiffs' and Class Members' purchase or lease of Defendant's defective Class Vehicles.

255. Defendant continued to conceal the defective nature of the Class Vehicles even after Class Members began to report the problems. Indeed, Defendant continues to cover up and conceal the true nature of the problem today.

256. As a direct and proximate result of Defendant's misconduct, Plaintiffs and Class Members have suffered and will continue to suffer actual damages. Plaintiffs and the Class reserve their right to elect either to (a) rescind their purchase or lease of the defective Vehicles and obtain restitution or (b) affirm their purchase or lease of the defective Vehicles and recover damages.

257. Defendant's acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and the Class's rights and well-being to enrich Defendant. Defendant's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of all others similarly situated, hereby requests that this Court enter an Order against Ford providing for the following:

A. Certification of the proposed Class, appointment of Plaintiffs and their counsel to represent the Class, and provision of notice to the Class;

B. An order permanently enjoining Ford from continuing the unlawful, deceptive, fraudulent, and unfair business practices alleged in this Complaint

C. Injunctive relief in the form of a *prompt, complete, and effective* recall or free replacement/repair program, including an order requiring Ford to issue direct mail notice to each Class Member, whether a current or former owner, through, *inter alia*, acquiring the addresses associated with each Class Vehicle's VIN number from the Departments of Motor Vehicles of the United States, as is done routinely in connection with notifying class members at class certification; notifying former owners of class vehicles of the availability of the recall and the opportunity for reimbursement; notifying current vehicle owners of the defect, its details and safety concerns, and of the prompt availability of a recall repair.

D. Equitable relief, including in the form of restitution and disgorgement;

E. Costs, restitution, damages, including punitive damages, penalties, and disgorgement in an amount to be determined at trial;

F. An Order requiring Ford to pay pre- and post-judgment interest on any amounts awarded, as provided by law;

G. An award of reasonable attorneys' fees and costs as permitted by law; and

H. Such other or further relief as may be appropriate.

**JURY DEMAND**

Plaintiffs hereby demand a trial by jury for all claims so triable.

Respectfully submitted,

Dated: May 8, 2025

/s/Russell D. Paul

Russell D. Paul (Bar No. 4647)
**BERGER MONTAGUE PC**
800 N. West Street, Suite 200
Wilmington, DE 19801
Phone: (302) 691-9545
rpaul@bm.net

Amey J. Park (*pro hac vice forthcoming*)
Natalie Lesser (*pro hac vice forthcoming*)
**BERGER MONTAGUE PC**
1818 Market Street, Suite 3600
Philadelphia, PA 19103
Telephone: (215) 875-3000
Fax: (215) 875-4604
apark@bm.net
nlesser@bm.net

Cody R. Padgett (pro hac vice forthcoming)
Abigail Gertner (pro hac vice forthcoming)
Majdi Hijazin (pro hac vice forthcoming)
Nate Kiyam (SBN 317677)
CAPSTONE LAW APC
1875 Century Park East, Suite 1000
Los Angeles, California 90067
Telephone: (310) 556-4811
Facsimile: (310) 943-0396
Cody.Padgett@capstonelawyers.com

Abigail.Gertner@capstonelawyers.com
Majdi.Hijazin@capstonelawyers.com
Nate.Kiyam@capstonelawyers.com

*Counsel for Plaintiffs and the Proposed Putative Class Members*